UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| JACK K. LUNA, ) | |
|    Plaintiff, ) | |
| ) | Civil Action No. 2:08-0047 |
| v. ) | Judge Wiseman/Brown |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
|    Defendant. ) | |

To: The Honorable Thomas A. Wiseman, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff disability insurance benefits (DIB) under Title II and Supplemental Security Income (SSI) payments under Title XVI of the Social Security Act (the "Act), 42 U.S.C. § 401-433. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. (Docket Entry 15), and the Commissioners Cross motion for Judgment on the Pleadings (Docket Entry 17). For the reasons stated below, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, the Commissioner's Motion be GRANTED, and that the decision of the Commissioner be AFFIRMED.

### I. INTRODUCTION

Plaintiff filed a Title II application for a period of disability and disability insurance benefits on December 8, 2004. Plaintiff also protectively filed a Title XVI application for supplemental security income on November 17, 2004. In both applications, the claimant alleged disability beginning December 17, 2001. The claims were denied initially on June 2, 2005, and

1

upon reconsideration on October 11, 2005. Thereafter, the claimant filed a timely written request for hearing on November 1, 2005 (20 C.F.R. 404.929 *et seq*. and 416.1429 *et seq*.). On September 20, 2007, the ALJ held a Video Hearing (20 C.F.R. 404.936(c) and 416.1436(c)). The Plaintiff appeared for the hearing in Cookeville, Tennessee, and the ALJ presided over the hearing form Knoxville, Tennessee. The Plaintiff is represented by Donna Simpson, an attorney. At the hearing, the Plaintiff amended his alleged onset date to August 31, 2003. (Tr. 16).

On November 2, 2007, the ALJ issued a written decision, denying Plaintiff's claims for a period of disability and disability insurance benefits. (Tr. 24). The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since August 31, 2003, the alleged onset date. (20 C.F.R. 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3. The claimant has the following severe combination of impairments: status post anterior cervical discectomy with instrumental fusion surgery; lumbar spine degenerative disc disease; and chronic pulmonary disease (COPD) (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform light work except he should avoid concentrated exposure to pulmonary irritants such as fumes, odors, dusts, gases and poor ventilation.

6. The claimant in unable to perform any past relevant work. (20 C.F.R. 404.1565 and 416.965).

7. The claimant was born on October 29, 1963 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

2

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education and work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, form August 31, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## II. REVIEW OF THE RECORD

Plaintiff was born on October 29, 1963 and has a limited education. (Tr. 23). He has past work experience as a motor vehicle assembler, a saw operator, a machine operator, a bulldozer operator, and a mechanic. *Id.* Plaintiff alleges that since August 31, 2003 he has been unable to work due to back and neck pain, breathing problems, and anxiety. (Plaintiff's Brief at 2).

Plaintiff's treatment history for these conditions is roughly as follows. Dr. Alan Drake treated Plaintiff for lower back pain from November 2001 until about August 2005. (Tr. 310-342). Plaintiff was evaluated by state agency physicians Drs. George Bounds and Robert Doster in May and September 2005, respectively. (Tr. 22). Plaintiff was treated by Dr. Ty Webb at Cumberland Family Care from July 2006 until the time of his hearing, in September 2007. (Tr. 492). Dr. Webb completed an assessment of Plaintiff's physical capabilities in September 2007. (Tr. 546-549).

A. <u>Treatment with Dr. Drake</u>

3

Plaintiff initially presented to Dr. Drake on November 1, 2001 for lower back pain that sometimes radiated down his right leg. (Tr. 342). During Plaintiff's treatment with Dr. Drake, he underwent the following diagnostic procedures and surgeries:

*December 2001*. Plaintiff underwent an MRI of his lumbar spine on December 3, 2001. The MRI showed degenerative disc desiccation, endplate changes and a non-compressive annular disc bulge. (Tr. 343). The impression was that there was no compressive disc pathology. Id. Plaintiff followed up with Dr. Drake on December 12, 2001, who noted lower back pain with mild radiation to the right knee. (Tr. 342). Dr. Drake's assessment was a non-compressive annular disc bulge at L5-S1. *Id*.

*December* 2002. A follow-up MRI on December 19, 2002 showed no changes from the prior study. (Tr. 331).

*June 2003*. Plaintiff had a lumbar myelogram on June 12, 2003, which revealed small ventral extradural defects at L2-3, 3-4 and L4-5, probably due to "minimal" disc bulges. (Tr. 326). There was no evidence of disc herniation, and the myelogram was otherwise normal. Id.

*January 2005*. Plaintiff underwent an MRI on his cervical spine on January 10, 2005. (Tr. 241, 320). The MRI showed preservation of the normal cervical lordosis with normal appearing craniocervical junction and cord without evidence of syrinx or myelomalacia, spondylosis at C3 with a central and leftward HNP resulting in mild central canal stenosis, central HNP with no substantive central canal stenosis at C4-5, and nominal noncompressive central HNP at C5-6. *Id*.

*April 2005*. Plaintiff underwent an anterior cervical discectomy with fusion and fusions with Bank bone arthrodesis on April 11, 2005. (Tr. 307).

4

*July 2005*.   Plaintiff had two MRI studies on July 28, 2005.  Just prior to these, on July 8, 2005, Plaintiff saw Dr. Drake again and complained of neck pain that had become much worse since the surgery. (Tr. 316).  Dr. Drake noted that Plaintiff had a full range of motion in his neck, and could not identify any muscular source of the pain. *Id*.  The first July 28 MRI study, on Plaintiff's cervical spine, suggested C4-5 facet subluxation. (Tr. 314).   The second MRI, of Plaintiff's lumbar spine, showed mild degenerative changes of the lumbar spine with no focal disc herniation or spinal canal compromise. (Tr. 313). These findings were not a significant change from the prior study of December 29, 2002.  *Id*.

The record also reveals the following significant notes from Plaintiff's treatment with Dr. Drake.

*2002*.  On March 22, 2002, Plaintiff told Dr. Drake that his pharmacy had lost his Phenergan refill and had not completely filled a previous order. (Tr. 341). On May 17, 2002, Plaintiff reported a flare-up of back pain through work, which included bending, twisting, and lifting. (Tr. 339).

*2003*.  On March 18, 2003, Plaintiff reported to Dr. Drake that he had continued working recently, which included lifting heavy parts and changing engines and transmissions. (Tr. 328). On April 18, 2003 Plaintiff complained of numbness in his left leg and foot. *Id*.  He also told Dr. Drake that he spilled his supply of Soma into the toilet, and would need an early refill. *Id*.

*2005*.  On March 10, 2005, Dr. Drake noted that Plaintiff had come for the purpose of acquiring pain pills. (Tr. 319).  Plaintiff reported that he had been dismissed from another clinic after a physician there learned that he had received a morphine injection at an emergency room. *Id*.  Plaintiff also told Dr. Drake that his pain medications had been stolen, but failed to provide a

5

police report. *Id*. Dr. Drake prescribed Percocet during that visit, but instructed Plaintiff that it was not a medication he would prescribe on a regular basis. *Id*.

On May 25, 2005, about 6 weeks after his discectomy procedure, Plaintiff presented for a follow-up with Dr. Drake, and stated that his pain was "10 times worse" than it was before the surgery. (Tr. 317). Dr. Drake noted that Plaintiff looked "clear-eyed" and did not "appear to be in significant pain currently." *Id*. Dr. Drake renewed Plaintiff's prescription for Vicodin, but warned that he would not prescribe any more pain medication and "urged [Plaintiff] to get away from any pain medication ASAP." *Id*. On August 12, 2005, Dr. Drake noted that Plaintiff had been picking up his Soma prescriptions early. (Tr. 310). Dr. Drake declined to prescribe any more Soma during that visit and also stated that he "simply cannot justify giving him Hydro's [sic] at this point." *Id*.

### B. State Agency Physicians

On May 26, 2005, Dr. George Bounds completed a Physical Residual Functional Capacity Assessment for Plaintiff. (Tr. 295 - 301). Dr. Bounds found that Plaintiff was capable of lifting 50 pounds occasionally, 25 pounds frequently, that he could walk or stand for 6 hours in an 8-hour workday, and that he could sit for 6 hours in an 8-hour workday. (Tr. 296). Dr. Bounds found no limit in Plaintiff's ability to push and pull. *Id*. Dr. Bounds noted that in spite of post-operative difficulties Plaintiff may have been experiencing, he should be expected to return to the above mentioned RFC by 12 months after the date of surgery, which would have been about April 2006. (Tr. 300).

On September 13, 2005, Dr. Robert Doster completed a Functional Capacity Assessment for Plaintiff. (Tr. 376-383). Dr. Doster found that Plaintiff could occasionally lift or carry up to 50 pounds and frequently lift or carry up to 25 pounds. (Tr. 377). He found that Plaintiff could

6

Case 2:08-cv-00047  Document 19  Filed 03/31/09  Page 6 of 20 PageID #: 59

stand/walk or sit for about 6 hours in an 8-hour workday. *Id*. Dr. Doster also found no limit in Plaintiff's ability to push and/or pull. *Id*. He indicated that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventialtion due to his COPD. (Tr. 380). Dr. Doster also noted that it was expected that Plaintiff's condition would improve as a result of his April 2005 surgery, and that within 12 months of that time Plaintiff should be able to perform the functional activities outlined in the RFC. (Tr. 383).

      C.      <u>Treatment at Cumberland Family Care</u>

Plaintiff began treatment at Cumberland Family Care with Drs. Ty Webb and Chet Gentry on July 12, 2006. (Tr. 492). His principal complaints were for low back pain and neck pain, and also reported that he has COPD. *Id*. He was taking Percocet, Soma and Relafen daily. *Id*. Dr. Webb noted that his back was straight, he was tender to palpitation in the lumbar area. *Id*. His range of motion was intact. *Id*. Straight leg raising test was negative times three. *Id*. Strength, sensation, and reflexes intact in both lower extremities. *Id*. Dr. Webb refilled his current pain medications on that visit. *Id*.

Plaintiff followed up with Dr. Webb on August 11, 2006. (Tr. 491). He reported no change in pain levels. *Id*. Dr. Webb noted that Plaintiff's range of motion was restricted, but that the strength, sensation and reflexes of upper extremities were intact. *Id*. Dr. Webb's assessment was chronic pain. *Id*. He refilled Plaintiff's pain medications. *Id*.

Plaintiff next saw Dr. Webb on August 15, 2006. (Tr. 490). Dr. Webb recommended that he try pain patches instead of oral medications. *Id*. Plaintiff saw Dr. Chet Gentry on October 10, 2006. (Tr. 487) Plaintiff reported cervical and lumbar pain. *Id*. Dr. Gentry refilled his prescription for Soma and Percocet, and prescribed Effexor. *Id*.

7

Plaintiff again saw Dr. Gentry on October 13, 2006. (Tr. 485). During this meeting Dr. Getnry discussed, among other things, the interrelation of emotions, mood disorders and sleep cycles with pain, effects of different drugs, the importance of exercise and weight control, and neurochemical basis of addiction. *Id*.

On November 30, 2006, Dr. Gentry noted that Plaintiff had good range of motion in his neck, and refilled his medication, noting that he was using them properly. (Tr. 482).

On January 5, 2007, Plaintiff reported that his pain medication had been stolen from his car. (Tr. 480). Dr. Webb noted a discrepancy between the dates of his account and the dates on which the prescriptions were filled, and declined to prescribe any more controlled medications for that month. *Id*. On January 29, 2007, Plaintiff reported that his pain level was markedly increased with the medications Dr. Webb substituted for Percocet and Soma earlier in the month. (Tr. 479).

Plaintiff presented for follow-ups and obtained refills of Percocet and Soma on a monthly basis between February and August 2007. (Tr. 472-478). He reported that the medication brought his pain to a tolerable level. (Tr. 477-478). On July 19, 2007, Dr. Webb noted that Plaintiff tolerated his reduction of Percocet well. (Tr. 473). On June 22, 2007 Plaintiff reported that he had recently taken a road trip. (Tr. 474).

D.  Dr. Webb's Functional Capacity Assessment

On September 19, 2007, Dr. Webb completed an estimate of Plaintiff's functional abilities. (Tr. 546-549). He found that Plaintiff was limited to lifting and carrying 10 pounds. (Tr. 546). With normal breaks, Plaintiff was restricted to standing or walking for two hours and sitting for four hours in an 8-hour workday. *Id*. Dr. Webb noted that Plaintiff is limited in his ability to push and pull in his upper and lower extremities. (Tr. 547). Dr. Webb also noted that

Plaintiff would be required to periodically alternate between standing and sitting. *Id.* Dr. Webb based his conclusions on Plaintiff's interview and history, but also noted that "Direct confrontation testing is recommended for more precise evaluation." *Id.* With respect to Plaintiff's ability to work, Dr. Webb indicated that Plaintiff's pain would often interfere with attention and concentration, and that he should be limited to a low stress job. *Id.* He also estimated that Plaintiff would need to sometimes take unscheduled breaks every 15-20 minutes during an 8-hour workday, and he would likely be absent more than four times per month. *Id.* Dr. Webb indicated that Plaintiff would be limited in reaching and handling. (Tr. 548). He also noted that Plaintiff's manipulative limitations would be "never overhead" and "repetitive movements requiring full arm strength are extremely limited." *Id.*

      E.     <u>Testimony at Hearing</u>

During his hearing before the Administrative Law Judge on September 20, 2007, Plaintiff described his neck and back pain. He stated that his neck pain has been considerably worse since his surgery in 2005. (Tr. 564). On the day of the hearing his pain level was at 9 out of 10 before he took his medication and 7 out of 10 after taking it. (Tr. 565-566). He also testified that numbness in his arms and hands has also gotten worse since his surgery, and that it often causes him to drop things. (Tr. 564-565). Plaintiff also described the pain in his lower back as being relatively constant, and that its severity was about a 7 out of 10 at the time of the hearing. (Tr. 569). He stated that his back pain limits him to 15 minutes of walking and about an hour of sitting. (Tr. 568). He sits in a recliner chair that delivers heat and massage three to four times per day for about an hour at a time. (Tr. 573). He described difficulty putting on his socks and shoes and sitting through a church service. (Tr. 575).

9

Plaintiff is able to drive an automobile and drove himself to the hearing. (Tr. 559-560). He lives with his parents, both of whom are over the age of 75, and his younger brother, who is 41. (Tr. 557-558). Plaintiff's father and brother are both physically incapacitated and must use wheelchairs. (Tr. 558-559). Plaintiff does no housework, yard work or grocery shopping. (Tr. 573). He does not assist his father or brother get in and out of their wheelchairs, but does do small things like get food for them. (Tr. 574). He testified that this father and brother have no home health care assistance, and that his mother is the only person who helps them in and out of their wheelchairs and bathes them. (Tr. 576).

Plaintiff also testified that he has been diagnosed with COPD (chronic obstructive pulmonary disease) and that taken on its own the COPD would be enough to prevent him from working. (Tr. 562). He experiences shortness of breath when walking, climbing stairs, or when the weather is hot. (Tr. 571-572). He must prop himself on three pillows to sleep. (Tr. 571). He smokes a half pack of cigarettes a day, but as recently as six months before the hearing he was smoking two packs a day. (Tr. 570). He has done nothing to try to quit smoking. *Id*.

F.     Treatment for Anxiety

Plaintiff has been experiencing anxiety and insomnia since at least April 5, 1999, when he saw Dr. Gamal Eskander and obtained a prescription for Xanax. (Tr. 375). Dr. Eskander discussed the habit-forming dangers of Xanax with Plaintiff on June 14, 2004. (Tr. 356). On September 8, 2005, Dr. Eskander told Plaintiff that he would not refill his Xanax prescription more than once every three months. (Tr. 351). From January 3, 2006 to August 7, 2007, Plaintiff was treated at the Walk In Clinic of Sparta for his chronic anxiety, and was again prescribed Xanax. (Tr. 423-430).

### III.  CONCLUSIONS OF LAW

#### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

#### B.  Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423 (d)(1)(A).  At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

11

(1) If the claimant is working and the work constitutes substantial gain activity, benefits are automatically denied.

(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments11The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1. or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the valuation process can be carried by relying on the medical vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability

determination. *Id*. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423 (d)(2)(B).

### C. Plaintiff's Statement of Errors

Plaintiff alleges two errors in the ALJ's decision: (1) that the ALJ failed to give proper weight to the opinion of treating physician Dr. Ty Webb; and (2) that the ALJ improperly discounted Plaintiff's testimony regarding his pain and capabilities as being less than credible.

#### 1. Dr. Webb's Opinion

The medical opinion of the treating physician is to be given substantial deference. *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (1992). However, the Secretary may reject the opinion of a treating physician when it is not sufficiently supported by medical findings. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (1997). Under the "treating source" rule, the ALJ must "'give good reasons' for not giving weight to a treating physician in the context of a disability determination." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004) (quoting 20 C.F.R. § 404.1527(d)(2)). "When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment

13

relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). "It is true, however, that the ultimate decision of disability rests with the administrative law judge." *Walker v. Sec'y of Health & Human Servs.,* 980 F.2d 1066, 1070 (6th Cir.1992).

The ALJ gave two principal reasons for diminishing the weight of Dr. Webb's September 19, 2007 functional assessment. First was Dr. Webb's written note on page two of the assessment that "direct confrontation testing is recommended for more precise evaluation." (Tr. 22). Second, the ALJ found that Dr. Webb's opinion is inconsistent with the overall evidence of record, including pain management records, objective diagnostic imaging results, and the opinions of two state agency physicians. *Id.* Specifically, the ALJ found that Plaintiff had reported his pain to be at a "tolerable" level, that diagnostic imaging results revealed only "mild" degenerative changes, and that the two state Physicians opined that Plaintiff was capable of medium level work. *Id.*

The undersigned finds substantial evidence to support the ALJ's decision to discount the weight of Dr. Webb's testimony. The rules prescribe a presumption of greater deference to treating physicians because of a treating physician's "greater opportunity to examine and observe the patient" and because the treating physician is "generally more familiar with the patient's condition than are other physicians." *Walker*, 980 F.2d at 1070. Dr. Webb's statement that "direct confrontation testing is recommended for more precise evaluation" suggests that, in Dr. Webb's estimation, he had insufficient knowledge of Plaintiff's medical condition to provide an authoritative assessment. The reasons for deferring to the treating physician's opinion are therefore not present here. The ALJ's decision takes the middle ground between Dr. Webb's

14

opinion and those of the two state agency physicians, Drs. Bounds and Doster, which were taken well after the alleged onset date. (Tr. 22). The foregoing is substantial reason for the ALJ's decision to weight the opinions of Plaintiff's physicians as he did.

The undersigned further finds substantial evidence to support the ALJ's determination that Dr. Webb's evaluation was inconsistent with the overall record. With respect to the results of Plaintiff's diagnostic testing, the ALJ had substantial evidence to find that they contradict Dr. Webb's evaluation. The record shows that Plaintiff underwent at least five diagnostic imaging tests between December 2001 and July 2005. As detailed in Section II above, these tests consistently produced findings of "mild" stenosis, "minimal" disc bulges, and an otherwise normal lumbar spine. (Tr. 241, 313, 326, 331, 343). The ALJ's finding is well supported by Sixth Circuit precedent. *See, e.g.*, *Lawson v. Comm'r of Soc. Sec.*, 192 F. App'x 521, 530 (6th Cir. 2006) (diagnosis of "severe" degenerative disc not enough to qualify for benefits); *Hash v. Comm'r of Soc. Sec.*, No. 08-5654, slip op. at (6th Cir. Feb. 10, 2009) (MRI of lumbar spine that showed "minimal" disc degeneration and "moderate" disc bulging did not establish an objective basis for finding disabling limitations, in contrast to physician's opinion).

2. Plaintiff's Credibility

The ALJ found that Plaintiff's testimony about his functional limitations could not be fully credited. (Tr. 22) An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C.A. §423 and 20 C.F.R. §404.1529(a)). Discounting the credibility of a claimant is appropriate to a certain degree where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id*. The ALJ may also consider

15

evidence of a claimant's daily activities in finding that a claimant's testimony is not credible. *Id*. at 531-532. If the ALJ provides specific explanations for his credibility finding, and if his finding is within the zone of reasonable choices, it should be upheld. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). A subjective assessment of pain symptoms is relevant to determining whether a claimant suffers from a disability, but is not conclusive evidence establishing a disability. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001) ("Subjective complaints of 'pain or other symptoms shall not alone be conclusive evidence of disability.' ") (quoting 42 U.S.C. § 423(d)(5)(A)).

There is a two-step process to evaluating Plaintiff's subjective claims of pain. The first step is to examine whether there is objective medical evidence of an underlying medical condition. If there is, the next step is to then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. C.F.R. 404.1529 (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir.1994)). "Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints 'based on a consideration of the entire case record.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4 (July 2, 1996)). Further, again, the ALJ is required to explain his credibility determination. *Id*. at 248.

The ALJ found Plaintiff's testimony about his pain level and physical limitations to not be entirely credible for several principal reasons: (1) his claims about daily activities and capabilities were simply not believable; (2) his reported levels of pain and limitations were not

consistent with other evidence in the record; and (3) his claim that COPD was so severe that it would disable him on its own was not supported by objective testing or Plaintiff's own behavior. (Tr. 22).

The undersigned finds substantial evidence to support the ALJ's conclusion. With respect to Plaintiff's level of daily activity, Plaintiff lives with his elderly parents and disabled brother, and the family has no caretaker come to the home. (Tr. 22). He testified that he does no housework, yard work or grocery shopping, and that his 75 year-old mother is the only person that helps his father and brother from their wheel chairs to their beds and bathes them. (Tr. 23). The ALJ found that these statements "strain believability." *Id*. Plaintiff was apparently also not entirely truthful about his mother's health condition. He testified that she has no health problems, but in fact she has a heart condition and has undergone cardiac stenting surgery. (Tr. 23). These circumstances provide a substantial basis for the ALJ to have questioned the likelihood that Plaintiff's account of his daily activities at home was entirely accurate.

Furthermore, the record shows that Plaintiff engaged in physical activity near or after the alleged onset date that would discredit his stated limitations. In 2003 he cut his finger after fixing a flat tire and doing some other work, which included changing transmissions. (Tr. 23). In 2004 he complained of low back pain after moving furniture. *Id*. Plaintiff is also mobile and drives himself places. In January 2007 he claimed his medication was stolen from his car. In June 2007 he reported back pain after having taken a "road trip" and he drove himself to the hearing in September 2007. In light of the inconsistencies between Plaintiff's recorded behavior and his statements about his daily activities, the undersigned finds that the ALJ has substantial reason for discrediting Plaintiff's subjective testimony about his physical capabilities.

The undersigned further finds substantial evidence for the ALJ's conclusion that

17

Plaintiff's reported levels of pain are not consistent with the overall record. As stated above, a Plaintiff's subjective claims of pain are relevant but not conclusive in determining disability. *Buxton*, 246 F.3d at 773. The ALJ noted that while claimant generally reported that his pain level was only three to four on a scale of ten with pain management, he claimed at his hearing that his pain level was seven out of ten with medication and nine out of ten without. (Tr. 22). Further evidence exists in the record. About a month after Plaintiff underwent cervical discectomy in April 2005, he told Dr. Drake that his pain was "ten times worse" than it had been before the surgery. Dr. Drake, observed, however, that Plaintiff was "clear-eyed" and did not appear to be in serious pain at that time. (Tr. 317). The ALJ further noted that in February 2007 Plaintiff told Dr. Webb that his medication brought his pain to a tolerable level. (Tr. 477-478). In July 2007 Dr. Webb reduced Plaintiff's dosage of pain medication and noted that he seemed to be tolerating it well. (Tr. 473). The undersigned finds that the ALJ has sufficiently articulated his reasons for reducing the credibility of Plaintiff's subjective testimony.

The undersigned further finds that Plaintiff's claim that his COPD is disabling on its own is not supported by objective evidence and Plaintiff's own behavior. Plaintiff testified at his hearing that he breathes harder or sometimes cannot breathe at all when he walks up stairs, when he walks for more than 15 minutes, or when it is very hot outside. (Tr. 572). The ALJ had substantial evidence for discrediting the severity of the claims. He noted that pulmonary function testing revealed only mild restriction consistent with borderline pulmonary obstruction. Further, Plaintiff testified that he had gone from smoking two packs of cigarettes a day to a half pack about six months before the hearing. (Tr. 570). He had been advised by doctors to quit, but had not even tried to do so. *Id*. The undersigned agrees with the ALJ's conclusion that somebody who frequently "can't breathe" would at least try to quit smoking, and therefore Plaintiff's

18

testimony is not fully credible. As the Sixth Circuit has stated, "The Social Security Act did not repeal the principle of individual responsibility." *Sias v. Sec'y of Health and Human Serv.*, 861 F.2d 475, 480 (6th Cir. 1988) (ALJ's finding of adverse credibility supported by claimant's failure to follow medical advice to lose weight and evidence that he continued smoking habit).

Although the ALJ made his findings without considering Plaintiff's apparent drug-seeking behavior, the undersigned notes that evidence of such behavior exists throughout the record and further substantiates the ALJ's decision. Plaintiff was discharged from a pain clinic because he received a morphine injection at an emergency room. (Tr. 319). On at least five occasions Plaintiff reported his medication lost or stolen, or finished a prescription early. (Tr. 341, 328, 319, 310, 480). Dr. Drake noted that Plaintiff failed to provide a police report and Dr. Webb noted a discrepancy in dates in Plaintiff's version of events. (Tr. 319, 480). Dr. Drake and Dr. Webb noted concerns about drug-seeking behavior numerous times. For example, on March 10, 2005 Dr. Drake began his treatment notes with "Jack is basically here wanting pain pills." (Tr. 319) In August 2005, after Plaintiff finished a prescription that should have lasted until November, Dr. Drake noted that he "can't justify giving any more hydro's" (Tr. 318). In January 2007, Dr. Webb declined to provide controlled medication for the rest of the month after Plaintiff reported his supply had been stolen. (Tr. 481).

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on the Administrative Record (Docket Entry 15) be DENIED, the Motion for Judgment on the Administrative Record by the Commissioner (Docket Entry 17) be GRANTED, and the decision of the Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to

file any written objection to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file and responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

      <u>/S/ Joe B Brown</u>
      Joe B. Brown
      United States Magistrate Judge